UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


CHARLES MONTAGUE            )
                           )
v.                         )            NO. 2:03-CV-113
                           )
HOWARD CARLTON, Warden     )


## MEMORANDUM OPINION

Charles Montague, a life-sentenced inmate with the Tennessee Department of Correction, has filed this *pro se* application for a writ of habeas corpus, 28 U.S.C. § 2254, attacking the legality of his confinement.[1]  There are several matters now pending, the first of which is petitioner's "objection" to an order issued by the magistrate judge, granting respondent's motion to late-file a motion to extend the time to answer, as well as the time-extension motion itself.  [Doc. 46].  The Court will treat petitioner's objection as an appeal of the magistrate judge's order, which after careful consideration of the record, will be **DISMISSED** because petitioner has failed to show that the challenged order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).  The magistrate judge's order **WILL BE AFFIRMED**. [Doc. 43].

---

[1]  By prior order, the case was dismissed as untimely under *Austin v. Mitchell*, 200 F.3d 391 (6th Cir. 1999)—the then-controlling case, but was remanded by the Sixth Circuit when *Austin* was overruled by *Cowherd v. Million*, 380 F.3d 909, 914 (6th Cir. 2004) (*en banc*).

Petitioner has also moved for a determination of the status of his case and for a hearing on respondent's dispositive motions. The former motion will be **GRANTED**; the latter will be **DENIED**. [Docs. 55, 56].

The next motions are respondent's motions to dismiss or for judgment as a matter of law, which are supported by a brief and copies of the relevant state court record. [Docs. 47, 48, 10, 16, 49]. Petitioner opposes those motions. [Doc. 50]. For the following reasons, the Court will **GRANT** respondent's motions and **DISMISS** the petition. [Doc. 47].

## I. <u>Procedural History</u>

In 1993, petitioner was convicted of first-degree murder by a jury in the Criminal Court for Washington County, Tennessee and sentenced to a life-term in prison. Petitioner was unsuccessful on direct appeal, *State v. Montague*, No. 03C01-9306-CR-00192, 1994 WL 652186 (Tenn. Crim. App. Nov. 21, 1994), *perm. app. denied* (Tenn. 1995); in petitioning for post-conviction relief, *State v. Montague*, No. E2000-00083-CCA-R3-PC, 2000 WL 949233 (Tenn. Crim. App. July 11, 2000), *perm. app. denied* (Tenn. Dec. 27, 2000);[2] and in obtaining state habeas corpus relief.

---

[2] The state appellate court affirmed the trial court's dismissal of the post-conviction petition with respect to some claims, but remanded the remaining claims for an evidentiary hearing. Later, petitioner moved to voluntarily dismiss the petition, which included claims of ineffective assistance of counsel and prosecutorial misconduct. His motion was granted and his case was dismissed on March 2, 2001. [Addendum No. 7, *Montague v. State*, E2002-00930-CCA-R3-PC (Tenn. Crim. App. Sept. 13, 2002) (unpublished order)]. A second state post-conviction petition was denied as time-barred. [*Id.*]. Petitioner also filed a prior § 2254 petition, in the interim between the state court's order of remand and the dismissal of the first state petition.

[Addendum No. 17, *Montague v. State*, E2002-0868-CCA-R3-PC (Tenn. Crim. App.

Nov. 15, 2002 (unpublished order)]. He now brings this federal petition for a writ of

habeas corpus, asserting, as grounds for relief, claims of ineffective assistance of

counsel, insufficient evidence, an invalid confession, judicial bias, evidentiary errors

on the part of the trial court, improper jury instructions, an invalid indictment, and

prosecutorial misconduct.

## II. **Factual Background**

The following factual summary is taken from the state appellate court's opinion

during petitioner's direct review:

> On May 4, 1992, the victim, Donnie McMillian, was found lying on
> the floor of a Johnson City apartment shot to death. An investigation
> ensued. Police learned that defendant and a friend, Jerry Jackson, met
> at about 10:30 that morning and went to an area in Johnson City
> known as "The Strip." The defendant, who wore a black sweat suit
> with red stripes, drove Jackson's Firebird automobile. They drank beer
> and visited with others for a time and then left to search for the victim
> at the Johnson Inn. Unable to find him, they returned to "The Strip."
> A few days earlier, the defendant had told Jackson that the victim
> owed him some money and that "if he didn't pay him he was going to
> take him out."
>
> At about 6:00 or 6:30 P.M., the two men returned to the Johnson Inn
> still in search of the victim. While there, they spoke with the victim's

---

The federal petition was dismissed without prejudice for petitioner's failure to exhaust his state remedies,
reinstated upon his own motion, and once again dismissed, also upon his own motion. *Montague v. Carlton*,
Civil Action No. 2:01-CV-11 (E.D. Tenn. Dec. 20, 2001).

girlfriend, Mary Latham, who directed them to a local bar called Julian's. The defendant found the victim there and asked about the money, but learned that the victim had only $25.00-apparently not enough to pay his debt.

At trial, Jackson testified that the defendant invited the victim and a fourth man, Vincent Kyle, to get into their car. Because the defendant said he needed to get something out of a locker there, he drove all of the men to the Johnson City Bus Station. When Kyle asked the defendant if he was getting a gun, the defendant only smiled in response. The defendant found that the bus station door he attempted to enter was locked and returned to the vehicle without going inside. At 8:30 P.M., the defendant dropped Jackson off at a rooming house, telling him he would pick him up the following morning. Yet he failed to show. Later, when Jackson took back possession of the car, he noticed what looked like blood on the interior. When he asked about the stain, the defendant answered that a child had spilled "chocolate or something."

Kyle testified that he had gone to the bus station with the defendant on at least one earlier occasion. At that time, the defendant had picked up two guns, one of which was a .25 automatic and the other a .380 automatic. Because Kyle owed the defendant $75.00, he remembered a previous declaration made by the defendant that he intended to "make an example" out of the next person who "mess[ed] him over."

Amy Campbell testified that at about 9:00 P.M. on the night of the murder she was driving in the area of the Liberty Bell Complex near Morningside Drive in Johnson City. A naked black male ran in front of her car, hit her front windshield, and pleaded for help. The man appeared to be bleeding. She then turned around and saw another black male apparently chasing the naked man. The second man told her to leave "or else." Ms. Campbell was unable to identify either of the two men but related that the second man was wearing a dark windbreaker-like jogging outfit.

Wallin Meyers testified that he was at his girlfriend's house in Johnson City on the night of the murder when he heard what he believed to be a gunshot. Shortly thereafter, he and his girlfriend drove through

their neighborhood where they saw a naked black male being chased by another black man. The second man was wearing "some sort of jump suit with red stripes on it." Meyers saw the naked man run toward a residence and bang on the door and observed the second man catch up, force the naked man into the yard, and pull him to the ground. Meyers saw the clothed, second man shoot twice. After the shots, the naked man ran to another residence and kicked his way in through a glass door.

Witness Sarah Funkhouser testified that she lived at 806 Morningside Drive. At about 9:00 P.M. she heard what she thought were two firecrackers. "[T]he next thing [she] knew ... this naked man [was] kicking his way into [her] apartment" through the glass door. Before the man could get the bigger door closed, a second man came into the apartment and the two men began fighting. As Ms. Funkhouser went to the kitchen to call 911, she saw the second man with a gun in his hand. After the two men fell behind the couch, she heard a shot and ran out of the apartment. When she looked back, the second man was kneeling in her yard. She could not remember what he was wearing, other than possibly a baseball cap.

At 9:35 P.M., Investigator Angelio Dalpiaz arrived at 806 Morningside Drive, Apt. 8. He found the naked, bloody victim lying face down on the floor of the apartment. The room was in complete disarray and there was blood on the wall. The investigator discovered one live bullet on the concrete pad at the front door, two shell casings, and one spent bullet in the apartment. All were Winchester .380 automatic. He also discovered a key and a white Bic lighter. Next, Investigator Dalpiaz went to 800 Morningside Drive where he found another spent cartridge on the front concrete pad, a hole in the front door, and a spent bullet on the other side of the front door. Both were Winchester .380 automatic.

During the course of the investigation, police determined that the key they had discovered belonged to Locker # 13 at the Johnson City Bus Station. Some of the fingerprints taken from the inside and outside of the locker matched those of the defendant. When the defendant was questioned on May 5th, officers observed that his right elbow was

injured but not bleeding.

Jetta Hackler testified that she heard sirens on the evening of May 4th. The next day she found a wallet which contained the defendant's social security card and other forms of identification near the school, not far from where the victim was found. The wallet contained no credit cards or cash.

Greg Ricker, a detective with the Johnson City Police Department, participated in the defendant's arrest and the search of Angelia Darden's apartment. Ms. Darden was the defendant's girlfriend and he had been staying at her apartment. They found no dark sweat suit with red stripes. Ms. Darden, however, told them that the defendant owned such a sweat suit and had been wearing it on the date of the murder.

Ms. Darden testified for the state that the defendant had left her apartment at about 10:00 A.M. on the date of the murder. When he returned at about 10:30 or 11:00 that night, he told her he had been fishing and out drinking with a couple of guys. He explained that he had hurt his arm when he fell out of the boat. Ms. Darden later heard the defendant leave the apartment for a few minutes and then return.

When questioned by Detective Ricker, the defendant said he had arrived at Jerry Jackson's mother's house between 8:30 and 9:00 A.M. on the morning of the murder and had then driven Jackson's car to "The Strip." He admitted that he had looked for the victim at the Johnson Inn. When he did not find him, he returned to "The Strip." The defendant also admitted going to Julian's to see the victim. He claimed, however, that he had dropped the victim off at the old Dunbar School at about 5:00 P.M., just after he left Jerry Jackson at the rooming house. The defendant said he returned to his apartment in Abingdon between 7:00 and 8:00 P.M. and had not left again that evening. When asked about the sweat suit, he stated he did not own one like that and had been wearing black denim jeans, a black leather jacket, a t-shirt and tennis shoes on the day of the murder. He told officers that his wallet had been stolen off the dashboard of his car and explained that he had injured his elbow while riding a bicycle.

Dr. William McCormick, a forensic pathologist, examined the victim's body the day after the murder. He testified that the victim had a minimum of three gunshot wounds. A shot to the head was fatal. The victim had both alcohol and cocaine in his system.

Because the state's proof had established that the murderer was about 5'l0" to 6' tall, the defense presented proof that the defendant was only 5'7- 3/4". One defense witness testified that the victim "may have" borrowed his bicycle on the day of the murder. Another defense witness testified that the defendant owned an expensive bike and that it was at a shop being repaired.

Hugh Boring testified that he had taken the victim and the victim's girlfriend to the Johnson Inn at about 5:00 P.M. on the date of the murder. He and the victim then went to Julian's. While there, he said he saw Vincent Kyle, Robert Jackson, and Earl Williams and a red "Trans Am type car." According to Boring, Williams wore a dark jump suit with stripes. He said the defendant wore a t-shirt and blue jeans on the evening of the murder.

Tony Milhorn, the night custodian at the Liberty Bell School, also testified for the defense. At about 9:00 P.M. on May 4, he was on break talking to the night security guard when he saw a tall man run past the window wearing a maroon warmup suit.

*State v. Montague*, 1994 WL 652186, * 1 - 4.


III. **The Dispositive Motions**

In respondent's motion to dismiss, he maintains that all but five of petitioner's claims were not presented properly to the state courts, have been procedurally defaulted, and should be dismissed for that reason. In seeking summary judgment, respondent asserts that the remaining claims—those involving insufficient evidence,

a suppression issue, judicial bias, an improper evidentiary ruling, and improper jury instructions, were adjudicated in state courts and that, under the deferential review standards for state court decisions in 28 U.S.C. § 2254, he is entitled to judgment as a matter of law on those five claims.

## IV. __Discussion__

The discussion begins with the procedurally defaulted claims, which have been grouped together for organizational purposes.[3]

## A. **Law of Procedural Default**

Under 28 U.S.C. § 2254(b) (1), a state prisoner's petition for a writ of habeas corpus will not be granted unless he has exhausted his available state court remedies. Exhaustion requires that a petitioner fairly present his federal claim first to the state courts in a procedural context where a merits review is likely. *Castille v. Peoples,* 489 U.S. 346, 351 (1989). A petitioner who has failed in this regard and who is now barred by a state procedural rule from returning with his claim to those courts, has met the technical requirements of exhaustion (i.e. there are no state remedies left to exhaust) and is deemed to have exhausted his state remedies, but to have done so by way of a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A

---

[3] Nine claims contained in the petition [Doc. 3, Claims 12A, 12B, 12C, 12F, 12G, 12I, 12J, 12S and 12T] were dismissed by prior order upon petitioner's motion and need not be addressed in this opinion. [Doc. 39].

petitioner who has actually presented his federal claim to the state courts, which have declined to address it due to his failure to meet a state procedural requirement, has committed a procedural default as well. *See, e.g., Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on appeal); *Reed v. Ross,* 468 U.S. 1 (1984) (same).

For all types of procedural default, federal review is foreclosed, unless the habeas petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Coleman,* 501 U.S. at 732. Cause can be shown where interference by state officials rendered compliance with the rule impracticable, where counsel gave ineffective assistance in violation of the prisoner's right under the Sixth Amendment, or where the legal or factual basis of a claim was not reasonably available at the time of the procedural default. *Carrier,* 477 U.S. at 488 and 492. To show prejudice, a petitioner must establish that the errors "worked to his **actual** and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

With these principles in mind, the Court turns to those claims which respondent contends have been procedurally defaulted.

B. **The Procedurally Defaulted Claims**

    1. <u>Trial and appellate counsel rendered ineffective assistance by</u>

*** *failing to assert or raise on appeal a defense of voluntary intoxication to negate the intent element of first degree murder* [Docs. 3, 35-2; Claims 12D, 01, 04];

*** *failing to challenge or raise on appeal the admission of fingerprint and palm print evidence* [*Id.*, Claims 12E, 02];

*** *failing to investigate, interview and offer Rusty Buck as a witness* [*Id.*, Claims 12H, 03];

*** *failing to raise a change-of-venue issue on appeal* [*Id.*, Claims 12K, 04];

*** *failing to challenge, either at trial or on appeal, jury instructions concerning reasonable doubt* [*Id.*, Claims 12Q, 13];and

*** *failing to object to excessive security measures, which included more than ten officers, two armed with weapons, being present during jury selection and the trial, giving the impression to the jury that petitioner was very dangerous.* [*Id.*, Claims 12U, 12].

2.  <u>The trial court lacked jurisdiction to try petitioner, due to an invalid indictment</u>.  [*Id.*, Claims 12V, 10].

3.  <u>The prosecutor engaged in misconduct by concealing certain pieces of evidence</u>.  [Doc. 3, Claim 12W].[4]

The above allegations of ineffective assistance of counsel were raised in the first post-conviction petition and were remanded  to the trial court for an evidentiary hearing.  Thereafter, the case was dismissed upon petitioner's motion.  Petitioner's second attempt at post-conviction relief was found to be untimely.  The allegations

---

[4]  In the interest of thoroughness, the Court will consider this claim, though recognizing that it was offered only in the petition, not in the amended petition and that, for this reason, it was likely abandoned.

regarding an invalid indictment were offered in a state habeas corpus petition, but the state court refused to address them because petitioner failed to present them in a correct procedural manner, given that the remedy of habeas corpus in Tennessee does not encompass this type of claim. The prosecutorial misconduct claim was one of the remanded claims in the first post-conviction petition but this petition was voluntarily dismissed before an evidentiary hearing was held. Therefore, these claims were not fairly presented to the state courts for consideration and, as discussed earlier, this constitutes a procedural default. Unless petitioner can show cause and prejudice, his procedural default bars federal review.

Petitioner has responded to the dispositive motions by making several arguments, some of which concern the procedures employed by the state post-conviction courts.[5] In the first of these, he suggests that his remanded post-conviction claims are not barred by the procedural default doctrine because the trial court failed to hold a hearing to ascertain whether his motion to voluntarily dismiss his petition was made knowingly, intelligently, and voluntarily. He further suggests that he was misled by the lack of a hearing to believe that he could re-file his post-conviction petition and reassert his claims and that, before dismissing the case

---

[5] Petitioner characterizes the voluntary dismissal of the state petition as a "waiver." However, petitioner did not *waive* post-conviction review; he chose to *voluntarily dismiss* his remanded petition, thus, *terminating* further review.

without prejudice, the trial court failed to warn him of the adverse consequences of a voluntary dismissal, namely that he could not raise those claims in a subsequent post-conviction petition.

None of these arguments supply cause. Petitioner has no constitutional entitlement to post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987) ("States have no obligation to provide [post-conviction] relief."). Therefore, an alleged error committed during state collateral proceedings is not cognizable in federal habeas corpus proceedings. *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review.") (citing, *inter alia*, *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986)).

Moreover, petitioner points to no authority, and none is known to the Court, which requires a court to apprise a petitioner as to the adverse consequences of a voluntary dismissal of a post-conviction petition or to ensure that a motion to voluntarily dismiss a post-conviction case is made voluntarily and knowingly. Indeed, the Supreme Court has held, in a somewhat analogous situation, that a federal district court need not warn a § 2254 petitioner that, if he dismisses his petition in order to exhaust his state remedies, the statute of limitations would bar his return to federal court. *Pliler v. Ford*, 542 U.S. 225 (2004). And, the writ of habeas corpus

has a place in the Constitution, but state post-conviction procedures do not. Next, petitioner argues that, under the analysis in *Maupin v. Smith*, 785 F.2d 135(6th Cir. 1986), no procedural default occurred, but that if it did, then the default may be excused by a showing of cause and prejudice, which he will establish if an evidentiary hearing is held, which he intends to seek. [6]

As petitioner indicates, a court in the Sixth Circuit must make specific inquiries when a state asserts that a petitioner's procedural default bars review of his federal claim. *Id.*, at 138. A court must apply a four-factor analysis to determine: 1) whether there is a procedural rule which applied to a petitioner's claim and whether a petitioner complied with the rule; 2) whether the procedural rule was actually enforced against a petitioner; 3) whether that rule is an adequate and independent state ground sufficient to block habeas review; and 4) whether a petitioner can demonstrate cause for his failure to comply with the rule and prejudice resulting from the alleged constitutional violation. *Id.*

---

[6] Petitioner's other arguments are irrelevant to a determination as to whether he committed a procedural default. For example, he contends that because he was not dealt with honestly and fairly, the doctrine of equitable estoppel applies to prevent respondent from raising a time-bar defense. However, respondent has not asserted that § 2254's statute of limitations bars petitioner's habeas claims. Petitioner further argues that Tennessee's Saving Statute was available and should have been applied to preserve the claims contained in his re-filed post-conviction petition. Whether and when state rules of procedure apply is a matter for the state courts to decide, and not the federal courts. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Petitioner focuses on the third factor, asserting that the post-conviction statute of limitations which was applied to him is not an adequate and independent state ground sufficient to bar federal review of his claim. This is so, he suggests, because Tennessee, as demonstrated by *Pike v. State*, 164 S.W.3d 257 (Tenn. 2005), does not always enforce its post-conviction statute of limitations.[7]

However, *Pike* is inapposite to petitioner's situation. *Pike* involves the *revocation of a waiver* of post-conviction review with respect to a first petition, not *enforcement* of the statute of limitations as to a second one. Also, the post-conviction petition filed in *Pike* was timely, *id.* at 259, whereas in petitioner's case, his second post-conviction petition was not. Thus, *Pike* does not help petitioner.

The Court finds that the post-conviction limitations statute was enforced against petitioner and that it is an adequate and independent state law ground so as to support a finding of procedural default. Therefore, because of this procedural default, the above claims may only be reviewed if petitioner establishes cause for his default and ensuing prejudice.

Petitioner asks for additional time to establish cause and prejudice and indicates, to that end, that he will move for an evidentiary hearing. The record discloses nothing which would warrant a cause-and-prejudice hearing, whether the

---

[7] Under the third factor in the *Maupin* analysis, only a state procedural rule which is consistently applied and regularly followed will be adequate to preclude federal review.

decision to grant a hearing is governed by statute, 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420 (2000), or by the Court's discretion. *Cristin v. Brennan*, 281 F.3d 404, 412 (3rd Cir. 2002) (finding that § 2254(e)(2) does not apply where the issue in an evidentiary hearing is "cause and prejudice," and not the factual basis of a claim).

Petitioner offers nothing resembling cause, but simply iterates the law concerning procedural default and the cause-and-prejudice exception, as set forth in several Supreme Court cases. As to a showing of prejudice, petitioner "incorporate[s] into this prejudice requirement, the argument that is contained within the Amended Habeas Corpus Petition-grounds # 01-15, and the original habeas corpus petition." Petitioner has not specifically identified, and the Court cannot discern with any degree of certainty, the nature and extent of the allegations of prejudice which are being incorporated. This method of pleading prejudice is abstruse and unacceptable. It is *petitioner's* responsibility to show prejudice and he must do so affirmatively and expressly. Although being mindful of the generous reading afforded *pro se* pleadings, the Court is not obliged to examine the lengthy arguments in his prior pleadings to glean from them possible prejudice. Absent a demonstration of cause and prejudice, federal review of these particular claims is foreclosed by petitioner's procedural default.

C.  **Law Governing Adjudicated Claims**

The standard which controls the review of adjudicated claims is found in 28 U.S.C. § 2254(d).  Under this standard, a district court may not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law  as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).  Also, a state court's findings of fact are presumed to be accurate and a petitioner bears the burden of rebutting the presumption by clear and convincing evidence.  *Spisak v. Mitchell*, 465 F.3d 684, 691 (6th Cir. 2006) (citing 28 U.S.C. § 2254(e)(1)).

D.  **The "Adjudicated" Claims**

1.  <u>There was insufficient evidence to sustain a first-degree murder conviction</u> [Docs. 3, 35-2, Claims 12L, 05].

Petitioner alleges that there was insufficient evidence that the homicide resulted from premeditation and deliberation, though both are elements of a first-degree murder offense in Tennessee.  More specifically, petitioner asserts that these elements were not proven because the State failed to show that sufficient time had

elapsed to permit him to reflect on the killing, but instead, relied upon repeated shots and the coerced testimony of paid witnesses, who had been intimidated and had made undisclosed deals with the prosecutors, to establish the elements of intent. Also omitted from the evidence, according to petitioner, was proof that he was free from excitement and passion—a necessary showing to support a conviction for premeditated first-degree murder. Pointing out that, under Tennessee law, all homicides are presumed to be second-degree murder, petitioner (impliedly) takes the position that, at best, the evidence supports a conviction for this lesser category of murder.

The rule which applies to a claim of insufficient evidence is contained in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Gall v. Parker,* 231 F.3rd 265, 287-88 (6th Cir. 2000). *Jackson* holds that evidence, when viewed in the light most favorable to the prosecution, is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Petitioner acknowledges that the state court correctly identified *Jackson* as the source of the relevant legal precedent, but contends that the state court unreasonably applied the *Jackson* principles to his case.

In addressing these issues, the Tennessee Court of Criminal Appeals, referring to the *Jackson* standard and to the applicable state law governing homicides, detailed the convicting proof adduced at trial. The state trial record included evidence that

petitioner had pursued the victim over some distance, that a key discovered at the scene matched a bus station locker which had his fingerprints on it, and that he was known to have stored guns in such a locker. Included also in the record was evidence that petitioner had searched for the victim because the victim owed him money and that petitioner had threatened to "take out" the victim if he did not pay that debt. And too, there was proof that, on the day of the murder, the victim had only $25, which apparently, the state appellate court noted parenthetically, was less than the amount owed.

Before assessing what admittedly was circumstantial evidence, the state appellate court noted that the jury, acting within its province, had accredited the testimony of the prosecution's witnesses. Ultimately, the state court decided that the convicting evidence was sufficient because a reasonable jury could have determined, beyond a reasonable doubt, the essential elements of first-degree murder.

At the time of the crime, Tennessee defined first-degree murder as an intentional, premeditated, and deliberate killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (1991) (repealed 1995). A premeditated act is "one done after the exercise of reflection and judgment; a deliberate act is "one performed with a cool purpose. *Id.* § 39-13-201(b). Proof of deliberation must include evidence of a cool purpose formed in the absence of passion or provocation. *State v. Hall*, 8 S.W.3d

593, 599-600 (1999) (citing Tenn. Code. Ann. § 39-13-201(b)(1) (1991) & Sentencing Commission Comments; *State v. Brown*, 836 S.W.2d 530, 539-40 (1992)). Nevertheless, a killing committed during a state of passion may rise to the level of first-degree murder, so long as the proof shows that premeditation and deliberation preceded the struggle. *Id.* at 600.

The jury heard evidence that, several days before the murder, petitioner remarked that, if the victim did not pay his debt, petitioner would "take out" the victim and that petitioner had also threatened previously to "make an example" out of the next person who "mess[ed] him over." Also in evidence was petitioner's concession that he had sought out the victim because of the preexisting debt. In addition, testimony was given that the victim had been chased some distance before the shooting, had crashed into the windshield of a moving vehicle, had pled for help from the driver, and that the second man, in hot pursuit of the victim, warned the driver to leave "or else." The state also produced evidence that the second man had fired two shots at the victim, after forcing him to the ground, and that the victim had escaped and then had rammed through the door of a residence. The occupant of that residence testified that she had heard two explosions, sounding like firecrackers, just before a naked man burst through the glass on her storm door and a second man barreled through the door after him. She stated that the two men fought and fell

behind the sofa, that the second man had a gun in his hand, and that she ran outside when she heard a shot. According to testimony by the pathologist who performed the autopsy, petitioner had been shot at least three times, including a fatal shot to the head.

Petitioner's announcement, prior to the murder, of his intention to kill the victim if he failed to pay the debt owed to petitioner not only supports that petitioner thought about the proposed killing beforehand (premeditation), but also tends to show a cool mind at work, one which has time to reflect on the intended action, free from the influence of passion (deliberation). This conclusion is bolstered by petitioner's comment that he intended to make an example of the next person who messed with him. The state offered much more circumstantial evidence supporting that the murder was premeditated and deliberate. For example, petitioner chased the naked victim for some unspecified distance; made a leave-or-else threat to the driver of the vehicle into which the victim had run; pursued the victim through the neighborhood, as he unsuccessfully searched for sanctuary; followed the victim into the apartment where he had fled; fought with him; and shot him at least three times, once in the head.

All of these actions evince that petitioner thought about the killing while in a cool state of mind and that, even if he was in a state of excitement or passion when

he chased, struggled with, and shot the victim, these events were preceded by premeditation and deliberation on the part of petitioner. In view of all the proof in the record indicating that the murder was the result of premeditation and deliberation, and not one of passion, the state court's resolution of this claim was not an unreasonable application of the *Jackson* standard nor based on an unreasonable determination of the facts. Since petitioner's claim of insufficiency of the evidence does not pass either of § 2254(d)'s tests, it will be dismissed.


2. Petitioner's statement to the police should have been suppressed because it was involuntary and unknowing [Docs. 3, 35-2, Claims 12M,06].

Petitioner was arrested in Abingdon, Virginia, brought to the Johnson City, Tennessee Jail, and questioned by the police. During his interrogation, petitioner made statements which were introduced against him at trial. Citing to *Miranda v. Arizona*, 384 U.S. 436 (1966),[8] petitioner first asserts that his statement should have been suppressed because, prior to the interview, he was not told that he had a right to remain silent. Nor did his questioners advise him that he enjoyed a privilege

---

[8] *Miranda* requires law enforcement officers to advise a suspect during custodial interrogation that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id*. at 444.

against self-incrimination and that he had a right to have counsel present during the interview. They simply assumed that he fully understood his rights.

During a hearing on petitioner's motion to suppress his statements, a waiver-of-rights form signed by petitioner was introduced as an exhibit and his attorney conceded that her client had received the required warnings. Indeed, the state trial court pointed to testimony that petitioner had been given *Miranda* warnings twice—once in Virginia and again in Tennessee—and noted, without contradiction from petitioner's attorney, that the "[d]efense does not contest that *Miranda* was somehow violated. The Court doesn't need to make a finding on that since it is not at issue." [Addendum No. 8, vol. 1, Motion Hrg. T. at 50].

Thereafter, petitioner attacked his statement at trial and on appeal as involuntary, not as a violation of the *Miranda* rule. *State v. Montague*, 1994 WL 652186* at 4. And the appellate court ruled only on the issue offered, i.e., whether petitioner's statement was voluntary. Thus, by failing to press the *Miranda* issue at trial and on appeal, petitioner has procedurally defaulted it.[9] Petitioner offers nothing resembling cause and prejudice to overcome his procedural default and federal

---

[9] Though neither party has addressed the issue of procedural default and "[w]hile the issue remains open in th[e Supreme] Court, *see Trest v. Cain,* 522 U.S. 87, 90, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997), the Courts of Appeals have unanimously held that, in appropriate circumstances, courts, on their own initiative, may raise a petitioner's procedural default, *i.e.,* a petitioner's failure properly to present an alleged constitutional error in state court...." *Day v. McDonough*, 547 U.S. 198, 206 (2006) (internal footnote omitted).

review is now barred. Furthermore, even if the state appellate court's finding that the statement was voluntary somehow encompassed the *Miranda* claim, petitioner can be granted no relief because, in view of the state trial court's presumptively-correct factual finding that he was advised twice of his *Miranda* rights, neither of § 2244(d)'s requirements have been met.

Petitioner next charges that his statement was involuntary, unknowing, and coerced by the atmosphere at the jail. In support of this claim, petitioner points specifically to the length of the interview, the number of armed officers present or sporadically in attendance during the interrogation, the disparaging comments those officers made regarding petitioner's truthfulness, the questions they asked him about certain witnesses' alleged statements, and the provision of a police-purchased meal from McDonald's to petitioner. Also, according to petitioner, the police officers impliedly promised that they would help him if he helped them. Disagreeing with petitioner's assessment of his claim, respondent argues that the state court's decision with respect to the suppression issue cannot be disturbed under the AEDPA's deferential review standards.

A defendant validly may waive a constitutional right if he does so voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. By the same token, a defendant may waive his privilege against self-incrimination and give statements and

those statements, if voluntary, are admissible at trial. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). To be voluntary, the waiver must be a free and deliberate choice rather than a result of intimidation, coercion or deception and made with full consciousness of the nature of the right being waived and the consequences attendant to the waiver. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

An assessment of the voluntariness of a statement encompasses the "totality of circumstances" surrounding the confession. *Arizona v. Fulminante,*, 499 U.S. 279, 285-86 (1991); *United States v. Watson*, 423 U.S. 411, 424 (1976). If elicited by law enforcement officials by means of psychological coercion, e.g., when their conduct is such as to overbear the accused's will to resist, a statement is not voluntary. *Miranda*, 384 U.S. at 448; *United States v. Haynes*, 301 F.3d 669, 193 (6th Cir. 2002).

Among the factors to be considered are whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; the use of physical punishment, such as the deprivation of food or sleep, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); and the use of threats, trickery, or cajolery. *Miranda*, 384 U.S. at 455-58. However, "coercive police activity is a necessary predicate to the finding that a [statement] is not

'voluntary.'" *Connelly, supra*, 497 U.S. at 167; *United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000).

In addressing this issue, the state appeals court first summarized evidence presented at the pretrial suppression hearing. Officer Angelio Dalpiaz testified that, when petitioner arrived at the Johnson City Police Department about 8:00 p.m. on May 5, 1994, he was advised of his constitutional rights and, thereupon, signed a waiver-of-rights form. The officer recounted that he had asked most of the questions, that, during certain periods, the tape recording of the interrogation was interrupted, that all officers involved in the investigation were armed, and that no threats or promises were made to petitioner. Also, there was testimony from officers indicating that petitioner answered questions without reluctance and did not request an attorney. Explicitly accrediting the officers' testimony, the trial court concluded that the statement was voluntary and that, while petitioner had been subjected to "some pressure," which it characterized as "legitimate police inquiry," the proof was inadequate to show that petitioner's will was overcome and that his statement "was not his own free act and deed." *Montague*, 1994 WL 652186, at *5.

The state appellate court, citing to state law, pointed out that the voluntariness of a statement depends upon whether it results from a petitioner's free and rational choice or from police conduct which overbears his will to resist and that, in making

this determination, the "totality of circumstances" test applies. Because the analysis the state courts employed to conclude that petitioner's statement was voluntary embraces the principles established in *Miranda*, *Bustamonte*, *Watson,* and *Connelly*, the state court's decision was not "contrary to" clearly established Supreme Court precedent. Petitioner's citation to *Mallow v. Hogan*, 378 U.S. 1, 7 (1964), calls for no different conclusion because the test for voluntariness relied upon in that case is no longer the standard of voluntariness. *Arizona v. Fulminante*, 499 U.S. at 285-86.

The question remaining is whether the state court reached its decision through an unreasonable application of the relevant precedents or an unreasonable determination of the facts before it. Petitioner bears the burden of producing clear and convincing evidence to rebut the presumption of correctness that attaches to the state court's conclusion, based on its implicit finding of credibility, that the proof was inadequate to show that his will was overcome and that his statement was not a product of "his own free act and deed."

Petitioner's mere reiteration of the contentions underlying his suppression claim will not suffice to carry that burden and does not establish that the state court's credibility finding was an unreasonable determination of the facts before it. *Cotto v. Herbert*, 331 F.3d 217, 233 (2nd Cir. 2003) (citing *Sanna v. Dipaolo*, 265 F.3d 1, 10 (1st Cir. 2001)). This Court concludes that the state court, in rejecting petitioner's

suppression claim, did not unreasonably apply the relevant precedents to the facts of his case. Hence, this claim will not support habeas corpus relief.

    3. <u>The trial judge's conduct at trial showed bias</u> [Docs. 3, 35-2, Claims 12N, 07].

    Petitioner's claim of judicial bias rests on his allegations that the trial court harshly criticized defense counsel in the presence of the jury and did not give curative instructions afterwards; that, after interrupting cross-examination, it interrogated a witness who had identified petitioner, thereby countermining defense counsel's effort to challenge her credibility; that it made comments which gave the jury the impression that it believed petitioner to be guilty; and [impliedly] that extra security measures visible at trial underscored that impression.

    The issue raised in petitioner's brief on direct appeal was whether he was prejudiced by the trial judge's conduct. [Doc. 18, Addendum No. 2 at 29-31]. As illustrations of such prejudicial conduct, petitioner pointed to the trial court's interrogation of a witness and its "lecture" to defense counsel, but omitted any allegation as to the extra security measures now advanced as part of his habeas claim. The Court concludes that the allegation involving extra security measures at trial, never raised in state court and technically exhausted, has been procedurally defaulted.

As supporting authority for the other alleged instances of the trial court's prejudicial conduct, petitioner relied on Tennessee cases, its evidentiary rules, and the state constitution. The United States Constitution was not mentioned. No federal cases were cited. The cases which were cited did not apply constitutional analysis to similar facts. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000) (A petitioner satisfies the fair presentation requirement by relying on federal decisions employing constitutional analysis; by relying on state decisions employing federal constitutional analysis; phrasing his claim in terms of constitutional law or in terms so particular as to call to mind a specific constitutional right; or alleging facts well within the mainstream of constitutional law). Moreover, petitioner did not assert, or even allege, that the trial court's questioned behavior exhibited bias, partiality, or partisanship. Challenging the trial court's interrogation of a witness, its lecture to defense counsel, and its questionable comments only as violations of state law does not exhaust the claim as a federal claim. *Picard v. Connor*, 404 U.S. 270 (1970); *Riggins v. McMackin*, 935 F.2d 790, 792-93 (6th Cir. 1991).

Granted, petitioner made a passing reference to the deprivation of a fair trial, arguing that the cited conduct violated the fundamental principle that a judge must say or do nothing to prejudice the rights of a party. [Doc. 18, Addendum No. 2 at 30-31]. However, "[g]eneral allegations of the denial of the right to a 'fair trial' or 'due

process' are insufficient to present a federal constitutional claim." *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). Nor is it sufficient to say "that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. 4, 6 (1982). The state court, presented with the alleged violation of state law, understandably limited its analysis to the application of state law. Therefore, the remaining parts of the judicial bias claim, bottomed solely on state law, appear to have been procedurally defaulted as well.

However, if petitioner's reference to denial of a fair trial fairly presented his federal claim to the state courts so as to avoid a procedural default, he is not entitled to the writ unless an independent review of the record and the relevant Supreme Court precedent leads this Court to conclude that the state court's disposition of the claim is at odds with § 2254(d)'s "adjudicated claims" standards. *See Stewart v. Erwin*, 503 F.3d 488, 493-94 (6th Cir. 2007) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

In state court, petitioner alleged that the trial judge had prejudiced the defense by interrupting and questioning a prosecution witness who was being cross-examined. The trial judge's interrogation of the witness, according to petitioner, placed undue emphasis on her ability to identify him. Petitioner's second illustration

of damaging judicial conduct was the trial court's "lecture" to defense counsel about the hearsay exception.

In addressing these contentions, the state court first examined the section of the trial transcript containing the exchange between the trial judge and the witness.[10]  It observed that, under the applicable state law, a trial judge may interrogate a witness to clarify a point or supply an omission, as long as the inquiry is impartial, does not reflect on the weight or credibility of evidence, and is not the type which might sway the jury.  Applying these legal rules to the record facts, the state court found that the trial judge's inquiry did not underscore the witness's ability to identify petitioner.  The state court found that, quite to the contrary, the witness's responses to the judge's questions had indicated the uncertainty of her description.

The next illustration of damaging judicial conduct offered to the state court was the trial judge's "lecture" to defense counsel about the hearsay exception.  The transcript showed that, in denying defense counsel's hearsay objection, the trial judge had remarked that the challenged evidence was "a question...a question is not hearsay."  [Doc. 18, Addendum No. 8 at 93-94].  The state court evaluated the

---

[10]    The witness, Amy Campbell, had testified that, while driving her car, she had observed a naked black male being chased by another black male wearing a windbreaker-type jacket.  During her cross-examination, the trial judge intervened to ask which man she had testified as to the size of, whether she had testified to the "exact height" of the men, and which man was taller.  She answered respectively that she had testified about the size of both men, that the "clothed one" was "about six two,"and that she did not know which man was taller though she knew which man was heavier. Cross-examination then continued.  [Doc. 18, Addendum No. 8 at 265].

statement, finding that it did not qualify as a lecture and that no one had alleged that the evidence was inadmissible as hearsay. The state appellate court eventually concluded, as to both charges of wrongful judicial conduct, that the trial judge had not behaved improperly and had not committed a reversible error.

Constitutional due process requires "a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations and internal quotation marks omitted). Bias is shown where a judge's comments evince "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). General allegations of bias and prejudice, however, are insufficient to establish a constitutional violation. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986). Instead, the judicial expressions of animosity must be "much more than subtle"—indeed, they must be extreme—to evidence bias. *Liteky*, 510 U.S. at 562.

Also, there is no general constitutional rule which prohibits a trial court from commenting on the evidence," *McBee v. Grant,* 763 F.2d 811, 817-18 (6th Cir.1985) (citing *Quercia v. United States*, 289 U.S. 466, 469 (1933)), and rarely are judicial rulings by themselves a valid basis for a claim of bias or partiality. *Liteky*, 510 U.S.

at 555. Finally, it is presumed that public officials, including judicial officers, have properly discharged their official duties, *Bracy*, 520 U.S. 909.

To obtain relief, petitioner must show that the result reached by the state court is not in keeping with the standards in § 2254(d), in that it contradicts the governing law in Supreme Court cases, applies that law unreasonably, or is based on an unreasonable determination of the facts in light of the evidence. The state court's resolution of the claim was none of these things.

The trial judge's inquiries during the cross-examination of the State's witness were not even close to being extreme or adverse to petitioner. His questions to the witness were not overly-intrusive and did not reveal any improper bias. And, there is no suggestion that the trial court's "lecture" on the hearsay rules was delivered in a rude manner or for any reason other than to set forth the basis for its evidentiary ruling. Petitioner has supplied nothing from which to conclude that, under the well established law in Supreme Court cases, the cited instances of judicial conduct resulted in actual prejudice to the defense so as to violate due process.

Accordingly, because the state court's rejection of petitioner's judicial-conduct claim was not contrary to or an unreasonable application of the legal principles contained in Supreme Court cases, it's decision may not be disturbed. Habeas relief is not warranted with respect to this claim.

4. <u>The trial court admitted testimony which lacked a proper foundation</u> [Docs. 3, 35-2, Claims 12O, 08].

Petitioner asserts that a prosecution witness, Vincent Kyle, while testifying at trial, was permitted to read excerpts of his prior testimony from the preliminary hearing transcript, over the defense's objection. By ruling that the witness could refresh his memory in this fashion, according to petitioner, the trial court denied petitioner a fair trial. This is so, he claims, because the ruling, in essence, allowed the State to "feed" the witness the answer it was seeking.

This claim was offered to the state appellate court on direct appeal as a violation of state evidentiary law. The state appellate court determined that the ruling did not violate Tennessee's evidentiary rules, citing specifically to Rule 612 of the Tennessee Rules of Evidence, which permits a witness to refresh his memory with a writing, and that it comported in all respects with state law. *Montague*, 1994 WL 652186 at *7.

Federal habeas corpus relief lies only for violations of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). State court interpretations of state law are not cognizable grounds for federal habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (finding that federal habeas corpus relief does not lie for errors of state law that do not rise to the level of a constitutional violation.)

Moreover, if this claim were cognizable and if it were presented to the state courts on constitutional grounds, the state court decision is not contrary to or an unreasonable application of federal law nor is it based upon an unreasonable factual determination. This claim provides no basis for habeas corpus relief.

5. <u>The trial court improperly charged the jury and refused to give instructions requested by the defense</u> [Docs. 3, 35-2, Claims 12P, 09].

Petitioner's last claim is that the trial court rejected his request to instruct the jury that deliberation [an element of first-degree murder] could not be formed in an instant and, instead, gave deficient or impermissibly vague instructions concerning the mental elements of the crime. He contends that the trial court, likewise, denied the defense's requested instructions that a homicide is presumed to be second-degree murder and that the burden of proving premeditation and deliberation which elevates a homicide to first-degree murder is borne by the prosecution. Also denied were his proposed instructions involving fingerprint evidence. The omission of all these instructions, he asserts, deprived him of a fair trial.

a) *Mental Elements, Presumption*

Petitioner requested that the jury be charged that:

"You must make a marked distinction between the term 'deliberation' and 'premeditation' and *must not substitute one for the other as these are two distinctive elements of first degree murder.* The deliberation necessary to establish first degree murder *cannot be formed in an*

*instant.* It requires proof that the homicide was committed with a cool purpose and without passion or provocation. *The law presumes a homicide to be murder in the second degree.* The State bears the burden of proof on the issue of premeditation and deliberation to elevate the offense to first degree murder."[11]

When petitioner advanced this claim on direct review, the Tennessee Court of Criminal Appeals first reviewed the trial court's failure to charge the jury on the presumption of second-degree murder. After observing that, under state law, a homicide is presumed to be second degree and that the jury was not so instructed, the state appellate court went on to find that the omission of this instruction was harmless error. It was harmless, according to the court, because the purpose of the instruction was to inform the jury that the state bears the burden of proving each element of first degree murder and because the instructions which were given fulfilled this purpose.

The state court then turned to the remaining alleged deficiencies in the instructions actually issued at petitioner's trial. The jury was told that a guilty verdict would require it to find, beyond a reasonable doubt, that petitioner had committed an unlawful and intentional killing and had done so deliberately and with premeditation. The trial court defined deliberation as an act "performed with cool purpose" and one

---

[11] In the state court, petitioner challenged the omission of the italicized sections as error.

that "requires some period of reflection, during which the mind is free from the influence of excitement or passion."

Then, moving to the concept of premeditation, the trial court told the jury that this element required an intent to kill formed prior to the act itself, though not for any definite period of time, that the killing must have been the product of reflection or judgment, and that an accused must be sufficiently free from excitement and passion as to be capable of premeditation and deliberation. The trial court further instructed that:

> If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

In resolving petitioner's claim, the state court found that the first-degree murder instructions mirrored the Tennessee Pattern Jury Instructions, that the definition of deliberation allowed a conviction of second-degree murder or voluntary manslaughter for a killing committed with passion, that this definition and the one on premeditation were in harmony with state law, and, finally, that the jury was accurately instructed on the burden of proof and on second-degree murder—a lesser included offense of murder in the first-degree. The state court reached the conclusion that the charge was satisfactory and, thus, it did not grant petitioner relief.

Rarely is habeas corpus relief justified by jury instructions which are erroneous under state law. *Gilmore v. Taylor*, 508 U.S. 333, 334 (1993). *See also, McGuire*, 502 U.S. at 72) ("As we have stated above, however, the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000) ("Principles of comity and finality ... command that a habeas court can not revisit a state court's interpretation of state law, and in particular, instruct that a habeas court accept the interpretation of state law by the highest state court on a petitioner's direct appeal"), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003).

The Court has examined the claimed instructional missteps, searched the allegations for the precise constitutional issues being raised, but has been unable to find any such an issue. The cases upon which petitioner relied in his brief on direct appeal were state law cases. [Doc. 18, Addendum No. 2, at 34-38]. True, petitioner did cite to one federal case [incorrectly, it seems];[12] however, the jury instructions under attack in that case involved a federal criminal statute, and not federal constitutional law. [*Id.* at 34]. Not surprisingly, the state court addressed and resolved petitioner's arguments on the basis of state law. In the instant petition,

---

[12]   Petitioner's brief cites *United States v. Montagomery*, 900 F.2d 388 (6th Cir. 1992), but a Westlaw search reveals that the correct citation is *United States v. Montgomery*, 9**80** F.2d 388 (6th Cir. 1992). The case located at 900 F.2d 388 is a 1990 case from the First Circuit entitled, *Anderson v. Beatrice Foods Co.*

aside from a passing reference to a due process violation, these particular claims also appear to be bottomed on state law, just as they were in state court.  Therefore, they do not supply a recognizable basis for issuance of the writ.

Of course, relief would be justified if the challenged instructions rise to the level of a constitutional violation.  *Estelle*, 502 U.S. at 72 (An improper jury instruction violates a defendant's constitutional rights if the instruction "by itself so infected the entire trial that the resulting conviction violates due process.").  At any rate, the state court found that the instructions with respect to first-degree murder were proper (under state law), that the mental elements of premeditation and deliberation had been correctly defined, that the burden of proof had been charged accurately, and that the jury had been instructed on the lesser-included offense of second-degree murder.  If these issues were decided on a constitutional basis (which this Court does not find), habeas corpus relief can be granted only if the state court decision was contrary to or an unreasonable application of the relevant law in Supreme Court cases or was based on an unreasonable determination of the facts.

The state court ruling was none of these things and the writ will not issue with respect to this claim.

b) *Fingerprints*

Because fingerprints found on petitioner's locker were introduced at trial as belonging to him, petitioner asked the trial court to instruct the jury that, in order for the fingerprint evidence alone to sustain a conviction, it must find that those fingerprints could only have been impressed during the commission of the crime.

The trial court refused to give the instruction sought, but issued the ones which follow.

> Fingerprint evidence has been presented in this case. You may consider this evidence in determining the defendant's identity as the person who committed this alleged crime. Fingerprint evidence is circumstantial evidence, that is, it is proof of collateral facts and circumstances from which the existence of a primary fact may be deduced by you according to reason and common experience. There are no two sets of fingerprints exactly alike. The weight to be accorded fingerprint evidence is a question for the jury to decide in light of all surrounding facts and circumstances of the case. [Doc. 49, Addendum No. 9 at 378-79].

Petitioner now contends that he was deprived of his right to a fair trial because, absent the requested instruction, the jury could have found him guilty solely on the basis that his fingerprints were on the outside of his bus station locker.

When this issue was presented on direct review, the appellate court observed that, in limited circumstances, fingerprint evidence alone will support a conviction, but that, in petitioner's case, the jury did not have to rely solely on fingerprint evidence since there was significant other evidence to sustain his conviction. It

characterized the fingerprint evidence as one small piece of the larger puzzle and determined that it was unnecessary to give the requested instruction.

Once again, this issue was resolved on the basis of state law and it, therefore, provides no foundation for issuance of habeas corpus relief, unless petitioner can show that the omission of the instruction rose to the level of a constitutional error. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). A constitutional error will occur if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous, or even 'universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (citing *Cupp*, 414 U.S. at 146, 147)). When a requested instruction is omitted, a court must compare the instructions given with those requested to determine whether the omission resulted in a denial of a fair trial. *Id.* at 154-55.

Fairly read, the instructions on fingerprint evidence did not apprize the jury that the mere presence of his fingerprints could establish guilt. In the instructions, the trial court defined fingerprint evidence as circumstantial evidence and told the jury that it could consider such evidence in determining petitioner's identity as the person who committed the crime. It also instructed the jury that justification of a verdict of guilty based entirely on circumstantial evidence [as was petitioner's], depended upon whether the circumstances, grouped together, were conclusive as to

petitioner's guilt. This instruction fairly informed the jury that circumstantial evidence, such as fingerprint evidence, had to viewed in toto, a charge which essentially apprized the jury that it could not base a finding of guilty on one circumstance ( such as the presence of petitioner's fingerprints on the locker), standing alone. [Addendum No. 9, at 378 ].

The absence of the requested instruction did not deny petitioner a fundamentally fair trial, and to the extent that the state court resolved the claim as a constitutional issue, no relief can be afforded unless that decision fails to satisfy the standards in § 2244(d). Petitioner has cited to no Supreme Court case, and the Court is unaware of one, indicating that the state court's rejection of the claim is based on an unreasonable determination of the facts or is contrary to or an unreasonable application of the governing law. Thus, the state court decision must remain undisturbed.

## V. <u>Conclusion</u>

For the above reasons, petitioner's appeal of the Magistrate Judge's order will be **DENIED**, and that order will be **AFFIRMED**; petitioner's motion for a determination of the status of this case will be **GRANTED**; his motion for a hearing will be **DENIED**; respondent's motions to dismiss and for judgment as a matter of

law will be **GRANTED**, and this petition and amended petition will be **DIS-MISSED**.

## VI.  Certificate of Appealability

Finally, the Court must decide whether to issue a certificate of appealability (COA).  Petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that reasonable jurists might question the correctness of the Court's procedural rulings or its assessment of his constitutional claims.  *See Slack v. McDaniel,* 529 U.S. 473 (2000).  The Court has found that many of petitioner's claims were procedurally defaulted and that he has not made a sufficient showing of cause and prejudice to overcome this obstacle.  The Court also found that the  claims which were adjudicated in state court would not support habeas corpus relief because, after an examination of the state court decisions, the record, and the relevant governing law in Supreme Court cases, those decisions did not run contrary to well established federal law, did not reflect that the state courts had unreasonably applied

that law, and did not demonstrate that the state courts had disposed of those claims by unreasonably determining the facts offered to those courts.

The Court now finds that reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), and will **DENY** issuance of a COA.  28 U.S.C. § 2253; Fed. R. App. P. 22(b).

A separate order will enter.


**ENTER**:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE